UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| DAVID B. SPENCER d/b/a CATAVA GROUP, INC., ) ) ) Plaintiff, ) ) v. ) ) SYNAIR CORPORATION, ) ) Defendant. ) | No. 1:04-CV-83 Judge Curtis L. Collier |

## **M E M O R A N D U M**

Before the Court is a motion for summary judgment filed by Defendant Synair Corporation ("Defendant") (Court File No. 38). Defendant has filed a memorandum in support of its motion (Court File No. 39) and *pro se* Plaintiff David B. Spencer ("Plaintiff") has submitted a response, a supporting memorandum, a variety of documents, and two videotapes opposing Defendant's motion (Court File Nos. 59, 60, 61, 62). Defendant filed a reply (Court File No. 47) and Plaintiff filed two further responses to that brief (Court File Nos. 53, 56). For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion.

### I. STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view

the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323, 106 S.Ct. at 2552.

The Court determines whether sufficient evidence has been presented to make an issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.     RELEVANT FACTS

In the fall of 2003, Plaintiff was working as an independent truck driver under the name of

the CATAVA Group, Inc., a Florida corporation Plaintiff had formed in 1995 (Deposition of David Spencer (hereinafter "Spencer Dep."), p. 54).[1] Plaintiff was and is the only shareholder of CATAVA (Spencer Dep. at 54-55). Plaintiff's truck is titled in his name while his trailer is titled in the name of his father (Ralph Spencer), but Plaintiff makes the payments on both pieces of equipment (Spencer Dep. at 55-56, 60).

On November 19, 2003, Plaintiff received an assignment from his broker, Trans Dynamics, Inc., in Atlanta, Georgia. Plaintiff was to pick up a load of chemicals from Defendant's plant in Chattanooga, Tennessee, and transport them to Teeler Industrial Tire ("Teeler Tire") in San Antonio, Texas. The chemicals were TyrFil LD Catalyst A and TyrFil LD Prepolymer B (Spencer Dep. at 89-90), which when mixed together form a synthetic urethane rubber used to fill tires in the place of air (Deposition of Gary Alcorn (hereinafter "Alcorn Dep."), p. 10).[2] The chemicals are stored and transported in 275-gallon plastic containers called "totes." Each tote rests on a wooden pallet and is enclosed in a steel cage which is bolted to the pallet. Neither chemical is classified as hazardous, the bill of lading stated they were nonhazardous, and, at least at the time, Plaintiff did not have a license to transport hazardous materials (Spencer Dep. at 16-18).

Defendant's employees loaded eight totes onto Plaintiff's trailer, four of each chemical. The totes were not leaking when they were initially loaded onto Plaintiff's truck (Spencer Dep. at 89). The next day, as Plaintiff traveled towards San Antonio, he began to feel ill and by that night he had become "really sick" (Spencer Dep. at 90). Specifically, Plaintiff claims he developed a headache, his nose began to run so badly it began to bleed, and he started coughing and vomiting (Spencer

---

[1] Excerpts of the deposition of Plaintiff David Spencer have been provided by the parties at Court File No. 38, Exh. 3, and Court File No. 59, Exh. A.

[2] Excerpts of the deposition of Gary Alcorn have been provided by the parties at Court File No. 38, Exh. 5, and Court File No. 59, Exh. B.

Dep. at 90-93). Plaintiff claims at this point he suspected the chemicals were leaking, but did not open the trailer to check or seek medical attention for his symptoms (Spencer Dep. at 93-94).

On the morning of November 21, 2003, Plaintiff arrived in San Antonio where Bill Teeler, Gary Alcorn, and some other Teeler Tire employees entered the trailer and unloaded the totes (Spencer Dep. at 94-95; Alcorn Dep. at 9). Plaintiff claims three of the eight pallets had "leaked over," there was a three foot by three foot damp spot or "plastic film" on the corrugated steel floor of his trailer, and some of the pallets and egg paper upon which the totes rested were wet with chemicals (Spencer Dep. at 38, 97-101, 106). Plaintiff claims "everybody" saw the leak and he told the Teeler employees he was having problems, thought he might be sick from the chemicals, and would be contacting them to "get a statement from you saying what happened and what you observed" (Spencer Dep. at 94-96). However, both Teeler and Alcorn testified they did not observe a leak in any of the totes or a puddle of TyrFil on the floor of the trailer, none of the seals were broken, neither became ill as a result of their exposure to them, and if any of the totes had been leaking they would not have accepted them (Deposition of Bill Teeler (hereinafter "Teeler Dep."), pp. 8-11[3]; Alcorn Dep. at 11-14, 16). Teeler testified he did observe some dark, dry residue on one of the pallets after Plaintiff pointed it out to him, but he did not know "where it came from or what it was or when it was done" (Teeler Dep. at 10-11, 25). Alcorn stated the pallets had "some TyrFil on them that was cured product from prior processing, but they didn't have any liquid TyrFil on them" (Alcorn Dep. at 14).

Plaintiff then proceeded towards California where he was scheduled to pick up a load of produce, but never made it past El Paso, Texas. On November 24, 2003, Plaintiff reported the leak

---

[3]Excerpts of the deposition of Bill Teeler have been provided by the parties at Court File No. 38, Exh. 4, and Court File No. 59, Exh. C.

to Chemtrec, the company designated on the bill of lading for emergency response. Plaintiff also reported the leak to his broker and Defendant (Spencer Dep. at 94, 109). At some point Defendant learned the place in California "wouldn't load me" because of the chemical spill, so he decided to head back home (Spencer Dep. at 64, 95, 109, 143). Some time before heading back, Plaintiff returned to the Teeler Tire facility and made some videotapes of the totes and pallets (*see* Alcorn Dep. at 16). Plaintiff then drove his truck back to his home in Melbourne, Florida (Spencer Dep. at 146).

A few days later, Plaintiff claims he had a telephone conversation with a toxicologist employed by Defendant in which Plaintiff described the damp spot on his trailer and the toxicologist told him "not to drive the equipment anymore because it was contaminated" and to "get replacement equipment because that stuff doesn't come out" (Spencer Dep. at 37-38, 40). Plaintiff does not remember this individual's name, but believes his position was industrial hygienist and claims to have been referred to him by Robert Conkle when he called Defendant to report the leak (Spencer Dep. at 38-40). Plaintiff testified he ran his equipment through a truck wash using soap and water but did not use anything stronger such as ammonia (Spencer Dep. at 47). Plaintiff ultimately went to a hospital where he received an x-ray and over the following months saw both a Dr. Nunez and a Dr. Jerry Pinto (Spencer Dep. at 109, 140). It does not appear Plaintiff has engaged in any trucking activities since the alleged incident involving Defendant's shipment of chemicals to Teeler Tire.

Plaintiff, acting *pro se*, filed the instant action on March 22, 2004, alleging the chemicals he was asked to transport were stored in "faulty containers or packaging systems" (Court File No. 1). Plaintiff seeks damages reflecting the cost of replacing his truck and trailer, his medical injuries, towing his damaged equipment, and lost income.

## III. DISCUSSION

For purposes of summary judgment, Defendant concedes genuine disputes of material fact remain as to whether any chemical leak occurred while Plaintiff was transporting the totes (Court File No. 47, p. 2). Defendant, however, contends it is still entitled to summary judgment because Plaintiff cannot prove he suffered any personal injury or that there was any damage to his equipment as a result of any leakage which might have occurred. Plaintiff's complaint presents his claim generally as a "toxic tort" action (Court File No. 1, p. 2) and his responses to Defendant's summary judgment motion make clear he intends to pursue a theory of negligence liability (Court File No. 62, p. 1; Court File No. 59, pp. 2, 17, 19). A negligence claim requires proof of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care and amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998). Defendant's summary judgment argument does not address the issues of duty and breach, but instead centers exclusively on the injury and causation elements.

Defendant contends it is entitled to summary judgment because "the undisputed expert testimony shows [Plaintiff] suffered no personal injury and there was no damage to his equipment" (Court File No. 39, p. 5). Defendant points out Plaintiff's theory as to how he suffered physical impairment and damage to his equipment is not supported by any expert testimony and, even assuming the leak occurred as Plaintiff claims, the testimony of Defendant's expert witnesses indicate Plaintiff either did not or could not have suffered the sort of injuries he now claims. To the extent Defendant argues it is entitled to summary judgment because Plaintiff has offered no proof he actually suffered any injury, the Court cannot agree. In addition to the allegations in the

complaint, Plaintiff has offered his own deposition testimony, the Chemtrec incident report indicating Plaintiff had complained of breathing problems shortly after the alleged spill, and medical documents indicating Plaintiff underwent a Methacholine Challenge Test in March 2005. Defendant counters with an expert report prepared by Dr. Vincent Viscomi, a licensed physician and board certified pulmonologist. After examining Plaintiff and reviewing test results, Dr. Viscomi opined Plaintiff does not suffer from asthma or reactive airways disease, he has not suffered any permanent physical impairment from exposure to chemicals, and he does not have any work restrictions as a result of any exposure to chemicals (Court File No. 38, Exh. 1). Plaintiff concedes no doctor has ever placed him on any work restrictions (Spencer Dep. at 33), but maintains he continues to suffer from chronic breathing problems which originated from the time of his alleged exposure. Further, Defendant has not sought to affirmatively disprove Plaintiff's allegation of damage to his truck. Therefore, giving Plaintiff the benefit of all reasonable inferences and credibility determinations, the Court finds Plaintiff has provided sufficient evidence for a rational jury to conclude Plaintiff suffered at least some sort of injury.

Defendant, however, also points out Plaintiff is not the owner of the trailer he used to transport the chemicals in this case and argues he therefore lacks standing to assert a claim for any damage which might have befallen that piece of equipment (Court File No. 39, p. 8). Indeed, Plaintiff has clearly testified the trailer was and remains titled to his father (Spencer Dep. at 55-56, 60). Therefore, because Plaintiff does not own the trailer which he alleges to have been damaged by Defendant's negligence it cannot be said Plaintiff has suffered any injury to his person or property. As noted by the Tennessee Court of Appeals:

> It may often happen that an injury to one person may affect another; a servant whose master is killed or permanently injured may lose his employment, [which] may be of long standing, and the misfortune may come when he is of an age when it would be very difficult for him to obtain other work, but no one would suggest that he

thereby acquires a right of action against the wrongdoer.

*Still by Erlandson v. Baptist Hosp., Inc.*, 755 S.W.2d 807, 813 (Tenn. Ct. App. 1988) (citing *Best v. Samuel Fox & Co.*, [1952] AC 716, 731 (per Lord Goddard)). Thus, although Plaintiff may have used the trailer and contributed to its financing, any claim for damages to the trailer rests exclusively with Plaintiff's father.

With respect to causation, Plaintiff has failed to offer any expert witness reports or testimony concerning the toxicity of TyrFil or the scientific particulars of how and why a spill of that chemical might have caused the injuries Plaintiff claims to have suffered. Instead, Plaintiff has offered his deposition testimony regarding the nature of his symptoms and their coincidence with the alleged chemical spill, the Material Safety Data Sheets ("MSDS") for the two chemicals involved, and Plaintiff's own opinions based upon his experience transporting produce. The MSDS sheets indicate contact with one or both of the constituent TyrFil chemicals can cause skin, eye, and/or respiratory tract irritation and, under certain conditions, may cause cancer. Further, the TyrFil LD Prepolymer B MSDS states "[r]epeated inhalation of vapors [of that chemical] may cause immediate or delayed respiratory sensitization" and federal regulations deem it to be an "immediate health hazard," "delayed health hazard," and a "reactive hazard." Additionally, Plaintiff has testified as follows:

> But what I was saying was when the pallets leaked, the gas and the vapors went through everything and then that's how I got sick. Because, you know, when you release that gas – when you release that chemical, it takes a form, you know, in the air and it becomes an inhalation hazard.
> So that's how I got sick, because it was – it broke containment. And by containment, if all the doors and the tops are shut, the door and the top of the reefer is shut, and you get your heat buildup and everything from the sun, that the stuff does go through the walls.

(Spencer Dep. at 47-48). Plaintiff stated he based this opinion on his experience carrying onions (Spencer Dep. at 48 ("they have a peppery smell and you can smell them outside the trailer")).

Defendant challenges Plaintiff's allegations and proof of causation by offering the expert

report of Dr. Robert J. Coots, a chemist with fifteen years of experience in the field of urethane and polyurethane chemistry. In his report, Dr. Coots offers the following opinions: (1) a spill of Tyrfil A or B "could be completely cleaned from the trailer using ordinary techniques," therefore, "there was no permanent contamination of the trailer"; (2) neither chemical has significant amounts of volatile components nor do they "produce enough airborne vapors to be able to permeate the entire trailer and then enter the truck and cause damage or an inhalation hazard," therefore Plaintiff's truck was not contaminated; and (3) in order for a spill or either chemical to have caused Plaintiff's alleged respiratory symptoms he would have had to have been in "close proximity" to the spill "for an extended period of time without any ventilation" (Court File No. 38, Exh. 2).

Cause in fact and proximate cause are "ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Hale v. Ostrow*, --- S.W.3d ----, 2005 WL 1538977, at *4 (Tenn. July 1, 2005). However, as noted by the court in *In re Meridia Prods. Liability Litig.*:

> Toxic tort cases present a unique challenge to the classical conception of causation. Other tort causes, such as slip-and-fall or car accident cases, feature scenarios where causation is fairly obvious – if one car collides with another, common sense dictates that a range of injuries from broken limbs to internal bleeding to death can result. Toxic tort cases, however, generally involve less common injuries that often function at the cellular level. The causation inquiry in toxic tort cases is more complicated because the injuries themselves are usually not immediately obvious and the connection between exposure and injury is not a matter of common sense or everyday experience. Moreover, a variety of exposures frequently can associate with the condition.

328 F. Supp. 2d 791, 798 (N.D. Ohio 2004). Accordingly, in toxic tort cases the causation inquiry is two-pronged. First, a plaintiff must show the substance to which he was exposed *can cause* the type of injury alleged and, second, the plaintiff must show that in his case, exposure to the substance *actually caused* the alleged injury. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988); *see also Goebel v. Denver & Rio Grande Western Ry. Co.*, 346 F.3d 987, 990 (10th Cir.

2003); *Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 928 (8th Cir. 2001). "It is settled law that plaintiffs in a toxic tort case must present competent expert testimony or other scientific evidence that links the individual plaintiff's harm to the toxic substance allegedly causing the plaintiff's injury. *Nelson v. Tenn. Gas Pipeline Co.*, 2002 WL 1397253, at *2 (W.D. Tenn. Jun. 11, 2002) (unpublished opinion) (citing *Nelson Tenn. Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001), and *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 814 (6th Cir. 1994)); *see also Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."); *Mitchell v. Gencorp.*, 165 F.3d 778, 781 (10th Cir. 1999) (holding to carry burden in toxic tort case, "a plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover'").

Outside the context of a professional malpractice action, there is no absolute legal requirement a plaintiff prove either negligence or causation through expert testimony. *See Rose v. Welch*, 115 S.W.3d 478, 484 (Tenn. Ct. App. 2003). Here, Plaintiff has offered his own sworn testimony of facts conceivably justifying an inference of causation and scientific documents, the MSDS sheets, which indicate it is possible for the chemicals at issue to cause, among other things, respiratory tract irritation. In contrast to these relatively general bits of evidence, Defendant has offered an expert opinion suggesting the chemicals and conditions in this case could not have resulted in the injuries Plaintiff claims. Nevertheless, it is the province of the jury to determine with Dr. Coots is credible and Plaintiff has offered at least a minimal evidentiary basis upon which a jury could find in his favor assuming it chooses not to accept Dr. Coots' opinion. Accordingly, the Court finds summary judgment inappropriate.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendant's motion for summary judgment with respect to Plaintiff's claim for damages to the trailer used to transport the chemicals Defendant is alleged to have negligently packaged, but will **DENY** said motion in all other respects.

An Order shall enter.

                                             **/s/**
                             **CURTIS L. COLLIER**
                   **UNITED STATES DISTRICT JUDGE**